UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PRENTICE A. BLAND,<br><br>Defendant. | CAUSE NO. 1:14-CR-14 DRL-SLC |

## OPINION & ORDER

Prentice Bland seeks to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) because of the COVID-19 pandemic and his health condition. Mr. Bland is being held at Ashland FCI. The court grants his motion.

## BACKGROUND

Mr. Bland has been incarcerated since his arrest on February 12, 2014. On February 25, 2015, Mr. Bland pleaded guilty to conspiring to possess with the intent to distribute 5 kilograms or more of cocaine and possessing a firearm in furtherance of a drug trafficking crime. *See* 21 U.S.C. § 846; 18 U.S.C. § 924(c). On November 8, 2019, after reassignment of this case to this presiding judge, Mr. Bland was sentenced to a total term of 111 months (51 months on count one and 60 consecutive months on count two).

Mr. Bland has served nearly 82 months. He is scheduled to be released from Bureau of Prisons custody on January 1, 2022 (ECF 586-1). He says he will be eligible for a halfway house on July 1, 2021 (ECF 586 at 2). Following his release, he must serve five years on supervised release (five years on count one and two concurrent years on count two).

Mr. Bland is concerned that his medical conditions increase his risk for COVID-19 infection and more severe COVID-19 symptoms. He says his age (45), type 2 diabetes mellitus, hypertension,

removal of his spleen (after having been shot in the abdomen), and disk and nerve damage in his spine create compelling reasons for compassionate release.

## STANDARD

Under 18 U.S.C. § 3582(c)(1)(A), federal courts may reduce a defendant's prison term when he has exhausted administrative rights to appeal the Bureau of Prison's decision to forego a motion for release or when thirty days have lapsed since his request was received by the warden, whichever date is earlier. Compassionate release is available when "extraordinary and compelling reasons warrant such a reduction," 18 U.S.C. § 3582(c)(1)(A)(i)-(ii), the sentencing factors support it, *see* 18 U.S.C. § 3553(a), and it is "consistent with applicable policy statements issued by the Sentencing Commission," 18 U.S.C. § 3582(c)(1)(A). *See also United States v. Jones*, 2020 U.S. Dist. LEXIS 128246, 3 (N.D. Ind. July 21, 2020); *United States v. Council*, 2020 U.S. Dist. LEXIS 102779, 3-4 (N.D. Ind. June 11, 2020).

The swift evolution of compassionate release in a COVID-19 world has left the sentencing guidelines without an applicable policy statement when a defendant (rather than the BOP) requests this relief, though the policy statement in place before the First Step Act was enacted (U.S.S.G. § 1B1.13) can provide guidance. *See United States v. Gunn*, 2020 U.S. App. LEXIS 36612, 6 (7th Cir. Nov. 20, 2020). Accordingly, the court proceeds under the statutory criteria—extraordinary and compelling reasons—with due regard to what proves helpful in U.S.S.G. § 1B1.13. *See id.*; *United States v. McGraw*, 2019 U.S. Dist. LEXIS 78370, 6 (S.D. Ind. May 9, 2019). Mr. Bland bears the burden in this motion. *United States v. Jones*, 2020 U.S. Dist. LEXIS 123449, 4 (N.D. Ind. July 14, 2020).

## DISCUSSION

A. *Exhaustion of Administrative Remedies.*

Mr. Bland says he sought compassionate release with the FCI Ashland warden who denied that relief. Mr. Bland includes an email he sent to his lawyer (seeking no legal advice) saying he was so upset when he received the warden's denial that he just tore it up. However unwise that was, the

government doesn't dispute that Mr. Bland exhausted his administrative remedies. Because the pandemic has slowed the acquisition of official BOP records at times as resources are smartly allocated where they are needed most, the court is satisfied that Mr. Bland has exhausted his administrative remedies. *See also United States v. Santiago*, 2020 U.S. Dist. LEXIS 108253, 6 (N.D. Ind. June 19, 2020) (citing *United States v. Taylor*, 778 F.3d 667, 670-71 (7th Cir. 2015)); *Council*, 2020 U.S. Dist. LEXIS 102779 at 10.

      B.     *Extraordinary and Compelling Reasons.*

Mr. Bland has shown extraordinary and compelling reasons to warrant compassionate release. His reasons for requesting compassionate release concern his age, his medical conditions, and the COVID-19 pandemic.

This district has considered several factors when assessing compassionate release requests because of the COVID-19 pandemic: the specificity of the defendant's COVID-19 concerns, his medical condition, age, and family circumstances, the extent to which the his release would mitigate or aggravate the pandemic, and any other reason left to the court's sound discretion. *See* U.S.S.G. § 1B1.13 app. n.1(A)-(D); *Gunn*, 2020 U.S. App. LEXIS 36612 at 6; *see, e.g., United States v. Stewart*, 2020 U.S. Dist. LEXIS 110114, 3-4 (N.D. Ind. June 23, 2020). The mere presence of COVID-19 in the defendant's facility doesn't alone justify compassionate release. *See Jones*, 2020 U.S. Dist. LEXIS 218953 at 5 (citing *United States v. Downing*, 2020 U.S. Dist. LEXIS 93865, 3 (C.D. Ill. May 29, 2020)).

To be sure, Mr. Bland's age (45) enhances his risk for hospitalization or death from COVID-19. By age alone, he is three times more likely to be hospitalized for COVID-19 and ten times more likely to die from it than the youngest of our tracked population (ages 18-29), though the chances remain significantly less than those within older age ranges where the risk tends to grow exponentially. *See* Ctrs. Disease Control Prev. (CDC), *Older Adults* (last visited Dec. 9, 2020).[1] To put that in the right

---

[1] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

light, individuals age 40-49 have a 0.4 percent mortality rate from COVID-19—not a significantly elevated risk as it turns out—though this category presents the most final of outcomes. His age alone may not then be compelling, but it cannot be cast aside or considered in a vacuum.

Mr. Bland's most worrisome condition is type 2 diabetes mellitus. Type 2 diabetes mellitus is a chronic condition that affects how the human body metabolizes sugar (glucose). Adults of any age with this condition are at increased risk of severe illness from COVID-19. *See* CDC, *People with Certain Medical Conditions* (last visited Dec. 9, 2020).[2] Dr. Stephen Edelman, a board-certified physician in diabetes and internal medicine, explains the danger faced by people with diabetes who contract COVID-19 (ECF 586-3). Someone like Mr. Bland not only is more vulnerable to contracting COVID-19 as a result of reduced immunity derived from his type 2 diabetes but is more likely to suffer serious and deadly consequences of COVID-19. Dr. Edelman explains that death from COVID-19 infection is more likely for those with diabetes because viral infection makes them more susceptible to pneumonia, kidney failure, and diabetic ketoacidosis. It remains especially critical that persons with type 2 diabetes have access to the best resources to manage glucose levels, observe social distancing measures, frequently clean, wear masks, and wear plastic gloves when they might be exposed to virus-laden surfaces.

The doctor's concerns are backed by the American Diabetes Association. The ADA echoes that people with diabetes face a significant and higher-than-average risk of getting seriously ill if infected with the COVID-19 virus, including the risk of death. The ADA urges detention centers to take aggressive steps to protect both the health of these individuals and larger public health interests in our communities, including consideration of compassionate release.

---

[2] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

Certain studies this year also underscore these concerns. "A few early studies have shown that underlying [cardiovascular disease] and diabetes mellitus are common among patients with COVID-19 admitted to ICUs." Soo Lim *et al.*, *Covid-19 and Diabetes Mellitus: From Pathophysiology to Clinical Management*, 17 Nature Revs. 11 (Jan. 2021). "Diabetes mellitus is one of [the] commonest noncommunicable diseases associated with worsening clinical status in COVID-19 patients." Chidiebere V. Ugwueze *et al.*, *COVID-19 and Diabetes Mellitus: The Link and Clinical Implications*, Dubai Diabetes & Endo. J. 1 (Oct. 23, 2020). Certain studies, including one available on the National Institute of Health's Public Health Emergency Collection, have expressed less concern about the risk of contracting COVID-19 with diabetes mellitus as much as disease progression: "a large body of evidence demonstrate[s] that diabetes is a risk factor for disease progression towards critical illness, development of acute respiratory distress syndrome, need for mechanical ventilation or admission to intensive care unit, and ultimately death." Giuseppe Pugliese *et al.*, *Is Diabetes Mellitus a Risk Factor for COronaVirus Disease 19 (COVID-19)?*, Acta Diabetol. 1 (Aug. 31, 2020).

Mr. Bland also has hypertension. He only "might" be at an increased risk for severe illness if he catches COVID-19 with this condition. *See* CDC, *People with Certain Medical Conditions* (last visited Dec. 9, 2020).[3] According to a study this past spring of 168 people who died of COVID-19, hypertension was the most common comorbidity at 50 percent, followed by diabetes at 25 percent. *See* Jianfeng Xie *et al.*, *Clinical Characteristics of Patients Who Died of Coronavirus Disease 2019 in China*, J. Am. Med. Assoc. Network Open (Apr. 10, 2020).[4] Of course, this peer-reviewed study concerned patients almost exclusively older than Mr. Bland (95.8 percent were older than age 50), who died during January 2020 before much of what is known about COVID-19 developed, and never concluded

---

[3] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[4] *See* https://bit.ly/2X5FJOo.

5

that hypertension had anything to do with causing death or rendering someone more susceptible to COVID-19 complications. Hypertension alone isn't cause for compassionate release, but that isn't all Mr. Bland has. He also has diabetes mellitus. "[C]onditions that cluster with diabetes in the context of the metabolic syndrome, such as obesity and hypertension . . . have also been associated with poor prognosis in these individuals[.]" Pugliese, *supra* at 1.

This week the court received additional information about Mr. Bland's injuries to his abdomen from a prior shooting. Mr. Bland had his spleen removed in 2008 after he was shot. Because of this, Mr. Bland also may be at increased risk for infection. *See* Mayo Clinic, *Splenectomy* (last visited Dec. 8, 2020).[5] Vaccinations from serious diseases become paramount for those without a spleen. Some research suggests that the "lack of a spleen has not been identified as a risk factor for acquiring COVID-19 or having worse outcomes," but even that research concedes that the ability to fight infection is "a little diminished" without a spleen. Harvard Health Blog, *No Spleen? What You Need to Know to Stay Healthy* (last visited Dec. 8, 2020).[6]

Medical science about COVID-19 remains ever-evolving, and the court accounts for this developing science in deliberating on Mr. Bland's overall condition. In short, Mr. Bland's type 2 diabetes mellitus is a legitimate and serious medical condition, and consistent with a basis for compassionate release under the policy guidance of the sentencing guidelines in a COVID-19 world given his overall health condition. *See* U.S.S.G. § 1B1.13 app. n.1(A)(ii), (D); *see, e.g., United States v. Pomante*, 2020 U.S. Dist. LEXIS 85626, 2 (E.D. Mich. May 15, 2020) (granting release for 69-year-old inmate with diabetes, hypertension, obesity, and chronic kidney disease); *United States v. Mattingley*, 2020

---

[5] *See* https://www.mayoclinic.org/tests-procedures/splenectomy/about/pac-20395066#:~:text=Splenectomy%20is%20a%20surgical%20procedure.

[6] *See* https://www.health.harvard.edu/blog/no-spleen-what-you-need-to-know-to-stay-healthy-2020042419641.

U.S. Dist. LEXIS 85935, 3-4 (W.D. Va. May 14, 2020) (granting release for inmate with diabetes, hypertension, and bilateral amputation of his legs).

The government contends that, though Mr. Bland's combination of medical conditions may constitute an extraordinary and compelling circumstance, his conditions are being well-managed within the BOP and he maintains the ability to self-care. The court agrees that the BOP is working hard to manage Mr. Bland's health conditions. For example, medical professionals have regularly seen Mr. Bland for his diabetes and prescribed medication for his diabetes and hypertension. More generally, the BOP is also working gallantly to manage inmate safety in the face of this pandemic. *See, e.g.,* BOP, *BOP Modified Operations* (last visited Dec. 8, 2020).[7] Accordingly, though Mr. Bland has a serious medical condition, it isn't such that would seem to diminish substantially his ability to provide self-care within the correctional institution. *See* U.S.S.G. § 1B1.13 app. n.1(A)(ii). The concern is more with the risk of contracting COVID-19, and whether he would recover in that event. *See* U.S.S.G. § 1B1.13 app. n.1(A)(ii), (D).

Circumstances continue to evolve at FCI Ashland. On November 3, 2020, there was only one COVID-positive inmate and no COVID-positive staff at the facility. Now, just over a month later, the numbers tell a different story. BOP, *COVID-19 Update*, (last visited Dec. 9, 2020).[8] Today, approximately 179 inmates at FCI Ashland have COVID-19 (aside from 21 staff members). One inmate at FCI Ashland has died. Of all 127 BOP-managed facilities, FCI Ashland has the ninth highest number of inmates who have tested positive. FCI Ashland has 979 total inmates, with 829 of them at the FCI and the 150 others at the camp. With 179 infected inmates, and those numbers seeming to grow over the course of the last month, the risk to Mr. Bland seems potent.

---

[7] *See* https://www.bop.gov/coronavirus/covid19_status.jsp.

[8] *See* https://www.bop.gov/coronavirus/

The court also obtained information from the U.S. Marshal Service specific to Mr. Bland. Mr. Bland is held in cell block C. As of December 4, 2020, there were no active COVID cases in that block. The BOP has implemented contagion-prevention protocols to contain the spread of the virus. That provides some comfort that the true risk hasn't manifested for Mr. Bland, but the trends at FCI Ashland nonetheless weigh on this deliberation. The government is quite right that COVID-19 is everywhere, and that Mr. Bland could well contract the virus in the public sphere. The court's order today limits that exposure by ordering home detention for a year—conceivably a reasonable period in which vaccination or other treatment will diminish the pandemic too.

Important to the outcome of this motion, there is currently a detainer for Mr. Bland's arrest in Marion County, Indiana. *See* MyCase, *State of Indiana vs. Bland, Prentice* (last visited Dec. 9, 2020). If the court were to grant this motion, Mr. Bland likely will end up initially in custody in Marion County, and that presents a host of concerns perhaps unmitigated by the court's granting of compassionate release—including the risk of exposure from his transfer and the risk of crosspollination between correctional facilities that current protocols discourage, whether he was first transferred to a local jail in Ashland, Kentucky while awaiting extradition to Indiana or whether he was promptly housed in one of two Marion County jails. That said, Marion County jails today have few current COVID-19 cases (one case in one jail and four cases in the other), so other than the risks precipitated by Mr. Bland's transfer or extradition, it cannot be said that releasing Mr. Bland would aggravate rather than mitigate the COVID-19 pandemic. *See United States v. Stewart*, 2020 U.S. Dist. LEXIS 110114, 3-4 (N.D. Ind. June 23, 2020). Indeed, most jails have implemented quarantine protocols that would place Mr. Bland in segregation when he arrived for fourteen days. Ordering his release, even under these circumstances, thus proves the greater benefit.

With how rapidly circumstances have changed throughout the pandemic, there is no guarantee that Mr. Bland will be safer at another prison as compared to FCI Ashland; but the offense for which

Mr. Bland has an outstanding warrant strikes the court as one that likely would result in release on bond. Indeed, in reviewing the state court docket for that case, he was originally released on bond for $300.00. This outstanding warrant alone thus doesn't change the calculus here. Mr. Bland has established a serious medical condition with specificity, and in a manner that raises extraordinary and compelling concerns about his continued incarceration on this federal sentence given the circumstances at FCI Ashland and given federal sentencing policy.

    C.    *Sentencing Factors under 18 U.S.C. § 3553(a).*

The 18 U.S.C. § 3553(a) sentencing factors support Mr. Bland's release. He has been in custody for just about 82 months. He received a 111-month sentence of imprisonment. The court's sentence was at the minimum of the guidelines range for count one (51 months) and was at the mandatory minimum for count two (60 months).

It certainly doesn't help Mr. Bland that he has an outstanding warrant based on another felony in Marion County, Indiana. It also doesn't help that it seems to be a drug-related offense—attempting to obtain a controlled substance by fraud (he allegedly forged a doctor's prescription for Roxicodone). In sentencing here, the court observed that Mr. Bland's federal charges weren't his first drug or gun-related offenses. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). Of course, his state charge stems from conduct on October 10, 2013, about when he went into federal custody, so it has some history to it. If federal sentencing presumes that incarceration will have deterrent and rehabilitative effects, then the court should not assume that 82 months of service have had no corrective effect on Mr. Bland to date. *See* 18 U.S.C. § 3553(a)(2)(B). In short, Mr. Bland has hopefully learned something since then.

The court recalls that the firearms offense here contemplated violence, but none occurred because it was impossible to occur. This was a government sting operation, and the drug house and dealers that Mr. Bland's cohorts were going to rob were fictional. *See* 18 U.S.C. § 3553(a)(2)(C). Still, his were serious offenses contemplating even more serious offenses. The court's order of home

detention will prove an effective deterrent for this last year of Mr. Bland's sentence, particularly given his good conduct to date while in prison. The government rightly notes the probation office's reduced ability to monitor released defendants, but Mr. Bland faces five years of supervision in total and he should be well advised that the court anticipates his compliance with the conditions of release. Future violations or crime may well alter the analysis here, particularly as the pandemic wanes after vaccinations become more readily available if the Food and Drug Administration approves one or more treatments in the next day or so.

Lest it be forgotten, Mr. Bland was the least culpable among the conspirators. He was a driver only. He didn't plan to participate in the actual robbery. He was the first member of the conspiracy to plead guilty and thus to take responsibility. The court observed at sentencing that a host of other mitigating factors existed, not least his health issues. *See* 18 U.S.C. § 3553(a)(1). He graduated from high school, had two longstanding jobs, and actively assisted our community's youth—all laudable. *See id.* He has maintained good conduct while incarcerated and improved his skillset, working as a unit orderly. *See United States v. Shaw*, 957 F.3d 734, 740 (7th Cir. 2020). He is employable again.

As he sits on the eve, a mere six months away, as a candidate for release to a halfway house, one must ask whether service of six more months or even twelve more months meaningfully fosters federal sentencing goals in counterbalance to the extraordinary and compelling risks he faces of COVID-19 complications. The answer: it doesn't.

CONCLUSION

In this COVID-19 world, Mr. Bland has demonstrated extraordinary and compelling reasons to warrant a sentence reduction that proves consistent with federal sentencing goals under 18 U.S.C. § 3553(a). Accordingly, the court GRANTS the defendant's motions to seal (ECF 587, 596); GRANTS his motion for compassionate release (ECF 586); and, to reduce the risk of recidivism, to protect the

public, and to help rehabilitate the defendant, ORDERS the defendant placed on home detention until January 1, 2022 with the following condition added to his supervised release conditions:

> 13. You must serve on home detention until January 1, 2022. Home detention will begin within 10 days of placement on supervision, with electronic monitoring (or an equally effective alternative form of surveillance, to ensure compliance with this condition), at your own expense through participation in a co-payment program administered by the probation office. During this time, you must remain at your place of residence except for times specifically authorized in advance by the probation officer. Failure to pay these fees will not be grounds for imprisonment unless the failure is willful.

The defendant's previous sentence is reduced to time served. His supervised release terms (five years on count one and two concurrent years on count two) otherwise remain unchanged.

This release order is stayed for up to fourteen days, for the verification of the defendant's residence and establishment of a release plan, and to make appropriate travel arrangements and to ensure the defendant's safe release, or alternatively to coordinate his extradition or transfer for the Marion County warrant. There must be no delay in completing these tasks. The defendant must be released from federal custody as soon as these tasks are accomplished. If more than fourteen days are needed, the parties must immediately notify the court and show cause why the stay should be extended.

The defendant must provide the complete address of where he will reside upon release to the probation office in the district where he will be released, noting that his release plan merely notes his wish to reside with his sister in Indianapolis, Indiana.

SO ORDERED.

December 9, 2020                    *s/ Damon R. Leichty*
                                    Judge, United States District Court